The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.



**/S/ RUSS KENDIG**

Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) CHAPTER 7 |
| STEPHEN EARL JACKSON & | ) |
| | ) CASE NO. 09-64920 |
| AMY L. JACKSON | ) |
| | ) JUDGE RUSS KENDIG |
| Debtors. | ) |
| | ) |
| | ) **MEMORANDUM OF OPINION** |
| | ) **(NOT FOR PUBLICATION)** |
| | ) |

On July 12, 2010, the United States Trustee ("UST") filed a motion to dismiss the case of debtors Stephen Earl Jackson and Amy L. Jackson ("debtors"). An evidentiary hearing was held on July 12, 2010 and a further evidentiary hearing was held on August 26, 2010. Donald L. Miller represented the debtors and Lenore Kleinman represented the UST. The UST's motion is now before the Court.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

# LEGAL BACKGROUND

Section 707(b)(1) and (3) provide in pertinent part:

> (1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter . . . .
>
> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter . . . the court shall consider . . . [whether] the totality of the circumstances of the debtor's financial situation demonstrates abuse.

Section 707(b) was amended by the passage of the Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA"). Prior to 2005, section 707(b) required a showing of "substantial" abuse before a case could be dismissed or converted and established a presumption "in favor of granting the relief requested by the debtor." Both the requirement that abuse be "substantial" and the presumption that relief be granted were eliminated by BAPCPA. In re Mestemaker, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). BAPCPA also created the "means test" of section 707(b)(2), which creates a presumption of abuse for above median income debtors. Id. at 865.

In determining whether a debtor's case should be dismissed under section 707(b)(1) and (3), bankruptcy courts in this district have applied the factors used by the Sixth Circuit Court of Appeals in pre-BAPCPA cases. E.g., In re Srikantia, 417 B.R. 505, 508–509 (Bankr. N.D. Ohio 2009) ("[P]re-BAPCPA decisions provide sound guidance and are instructive in evaluating motions to dismiss."); Mestemaker, 359 B.R. at 856; In re Simmons, 357 B.R. 480, 489 (Bankr. N.D. Ohio 2006). However, while the basic character of the analysis is unchanged, courts have recognized that the 2005 amendments have lowered the United States Trustee's burden. Mestemaker, 359 B.R. at 856 ("The court emphasizes, however, that Congress has clearly lowered the standard for dismissal in changing the test from 'substantial abuse' to 'abuse.'").

A determination that abuse has occured can be predicated on either a lack of honesty or a lack of need. In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989)). In determining whether a debtor is honest, courts should determine if the debtor is "merely seeking an advantage over his creditors, or instead is 'honest' in the sense that his

2

dealings with creditors have been marked by essentially honorable and undeceptive dealings." In re Behlke, 358 F.3d 429, 434 (6th Cir. 2004). Factors to be considered in determining whether a debtor is honest include whether the debtor has consistently lived beyond his means, the debtor's good faith and candor in filling out schedules and other documents, whether the debtor has engaged in "eve of bankruptcy" purchases, and whether the debtor was forced into chapter 7 by unforeseen or catastrophic events. Krohn, 886 F.3d at 126.

The primary factor in deciding whether a debtor is needy is whether the debtor can repay his debts out of his future earnings. Krohn, 886 F.2d at 126–127 ("That factor alone may be sufficient to warrant dismissal.") Courts have dismissed the cases of debtors who can make substantial payment to their general unsecured creditors in a chapter 13 plan. Behlke, 358 F.3d at 437 (pre-BAPCPA opinion dismissing case where debtor could pay 14% dividend to general unsecured creditors over 36 month plan); Mestemaker, 359 B.R. at 857 (dismissing case where debtors could pay 10% to 15% dividend to general unsecured creditors). Other factors the court may consider include whether the debtor enjoys a stable source of income, whether the debtor's expenses can be reduced, and whether the debtor's financial situation is the result of an unforeseen catastrophic event. Krohn, 886 F.2d at 126–128.

## FACTUAL BACKGROUND

Prior to mid-2008, debtor Amy L. Jackson ("Mrs. Jackson") was married to a businessman named Matthew Meek ("Mr. Meek"). At that time, she lived in a million-dollar lakefront house, traveled the world, wore designer clothes and generally had a lavish lifestyle. Not all was well, however. She testified that her marriage was volatile and that she had a secret bank account into which she was depositing money in case she needed to hire a divorce attorney.

In mid-2008, Mrs. Jackson or Mr. Meek filed for divorce. As part of the divorce proceedings, they entered into a separation agreement. The separation agreement provided in relevant part that Mr. Meek would pay Mrs. Jackson $1,500 per month for 36 months as spousal support, that Mr. Meek would take over the household debt and that Mr. Meek would pay Mrs. Jackson the sum of $50,000. The parties also entered into a shared parenting agreement in which Mr. Meek agreed to provide a total of $1,000 per month to support their three children. This amount was recently reduced to $600 per month by court order.

Prior to the divorce, Mrs. Jackson drove a current-model-year Yukon Denali, which was the property of Mr. Meeks's company. Around the time they got divorced, Mr. Meek gave Mrs. Jackson $15,000 to purchase another vehicle. After the divorce was finalized, Mr. Meek and Mrs. Jackson disagreed whether the $15,000 should be considered part of the $50,000 allocated by the separation agreement. On July 17, 2009,

3

the domestic relations court ruled that the $15,000 payment was part of the $50,000. Mrs. Jackson testified that she did not appeal this determination because she could not afford the expense of the appeal.

Following the divorce, Mrs. Jackson began making plans for her new life. She put $15,000 of her money from the separation agreement down on a Lincoln MKX sport utility vehicle and financed the balance. In addition, she put $17,877 down on a residence located at 141 East Mohawk Drive, Malvern, OH 44644 ("East Mohawk property"), financed the remaining $203,000 and granted a mortgage to Wells Fargo. Finally, she enrolled in online classes in early childhood education. She testified that she planned to use the remainder of her divorce settlement (which she supposed would be $33,000) and her spousal support to pay her bills until she could get a job as a teacher.

Mrs. Jackson's plans went badly. The $400 per month payment on the Lincoln MKX was more than she could afford, and the East Mohawk property ended up in foreclosure. In part, she blamed her problems on the fact that the $15,000 Mr. Meek gave her to buy her vehicle was classified as part of the $50,000 settlement. In part, she blamed her own choices. She described the Lincoln MKX as a "ridiculous vehicle" and acknowledged that she could have gotten a larger settlement at the time of the divorce.

Mrs. Jackson married Stephen Earl Jackson ("Mr. Jackson") in mid-2009. The record contains little background information concerning Mr. Jackson. He has been the service director for the Village of Minerva, Ohio for the past 30 years, earns $45,000 per year and drives a 1995 Chevrolet Blazer worth approximately $500. Every two weeks, $50 is taken out of Mr. Jackson's paycheck and placed in a deferred compensation account.

Following their marriage, the debtors downsized their house and their car. On April 26, 2010, the debtors signed a contract for the purchase of a property located at 508 N. Market Street, Minerva, OH ("Market Street property"). The total purchase price of the Market Street property was $108,000. The sales agreement required a down payment of $3,000, which Mr. Jackson withdrew from his deferred compensation account. On November 9, 2009, Mrs. Jackson traded in the Lincoln MKX for a 2003 Honda Pilot with 132,222 miles. After applying the equity from the Lincoln, the purchase agreement required that the debtors pay $3,039 in cash. The debtors testified that they obtained the cash from Mr. Jackson's father, Robert E. Jackson.

On November 19, 2009, the debtors granted Robert E. Jackson a lien on the Honda Pilot in the amount of $9,000. The lien partially secured the approximately $21,000 that the debtors owed to Robert E. Jackson. The debtors testified that they granted the security interest on the advice of their original bankruptcy lawyer, Clark Battista. The debtors' original Schedule J shows a $280 monthly payment to Robert E.

4

Jackson. After the UST's motion to dismiss was filed, Donald M. Miller replaced Clark Battista as the debtors' attorney. According to the debtors' testimony, attorney Miller advised the debtors that they should not have granted Robert E. Jackson a lien on the Honda Pilot in contemplation of bankruptcy. The debtors testified that Robert E. Jackson agreed to release his lien and, on April 19, 2010, the debtors filed an amended Schedule J, which did not show a $280 monthly payment to Robert E. Jackson.

Catherine Lowman is a Bankruptcy Analyst for the UST. At the hearing, she testified that the debtors have been living far beyond their means, both before and after the petition. Amended Schedule J indicates that the debtors earn and average of $4,500 per month. By contrast, the debtors have spent an average of $5,943 per month over the last seven months. The debtors' bank statements reveal that they eat out almost daily. Indeed, the debtors appear to have an uncommon affinity Mexican eateries including Chips N Salsa, Don Pancho's, El Paso, El San Jose, Mariachi's, Zoccallo Grill, El Campesino, and Jalisco's. Catherine Lowman also testified that the debtors spent excessive amounts on a vacation in Hilton Head, South Carolina in July of 2010. During their time in South Carolina, the debtors ate out nearly everyday and did considerable shopping. Finally, Catherine Lowan pointed out that the debtors have numerous overdraft charges on their bank statements. Indeed, between June of 2009 and December of 2009, the debtors were charged over $1,000 in overdraft fees.

In response, the debtors argued that they were spending "their own money" because to the extent that their spending exceeded their monthly income, they were using money that was gifted to them from Mr. Jackson's father, the overages from student loan disbursements, and transfers from Mr. Jackson's deferred compensation accounts. They point out that when these sources of income are included, the inflow and outflow of money from the debtors' bank account are approximately equal.

The debtors have $238,771 in general unsecured debt. Very little of the debtors' debt is joint. Mr. Jackson's debts include two lines of credit with Bank of America for $13,889 and $20,077 and a line of credit with U.S. National Bank for $14,823. These accounts were opened prior to 2007. He also lists an unsecured debt to his father in the amount of $21,000. Virtually all argument centered on Mrs. Jackson's financial history with little explanation of the large unsecured debt compiled by Mr. Jackson. Mrs. Jackson, on the other hand, has numerous small credit cards including accounts with American Eagle, Dillard's, Express, JC Penny's, Kohl's, Macy's, Maurice's, New York & Company, Old Navy, Sam Levin, Sam's Club, Value City Furniture, and Victoria's Secret. For the most part, these accounts were opened since 2007.

## ANALYSIS

The Court finds that, even though the debtors are needy, their case must be or converted for lack of honesty as that term is used in bankruptcy law.

09-64920-rk    Doc 52    FILED 09/17/10    ENTERED 09/17/10 16:19:06    Page 5 of 8

*A. Need*

The debtors are clearly needy as that term is used in In re Krohn, 886 F.2d 123 (6th Cir. 1989)).
They have a modest income and face a mountain of debt. As such, they cannot currently fund a chapter 13 plan that would result in a meaningful repayment to creditors. Furthermore, the debtors' situation is likely to become more difficult after the termination of Mrs. Jackson's spousal support.

*B. Honesty*

The Court concludes that the debtors' case must be converted or dismissed under Krohn's "lack of honesty" prong due to the debtors' spending, which is far in excess of their income. The debtors' bank statements show that their monthly spending outstripped their income by almost $1,500 per month in the months leading up to the petition date. Furthermore, much of the spending has been on luxuries, especially eating out. Even more troubling, the debtors' spending actually accelerated in the month following the petition date. This suggests that the debtors have not embraced a new attitude of financial responsibility as a result of filing for bankruptcy.

In Krohn, the Sixth Circuit Court of Appeals confronted a similar situation. The debtor could not fund a chapter 13 plan and showed a consistent pattern of living beyond his means in the months immediately prior to filing a chapter 7 petition. Id. at 127. The court upheld the bankruptcy court's dismissal of the debtor's case because of his excessive lifestyle. Id. at 126 ("The debtor herein, although he has minimal assets, appears to be seeking a 'head start' with no attempt to deal with creditors on an equitable basis."). See also In re Blum, 255 B.R. 9, 11 (Bankr. S.D. Ohio 2000); In re McCormack, 159 B.R. 491, 494 (Bankr. N.D. Ohio 1993). As in Krohn and its progeny, the debtors in this case have failed to treat their creditors fairly by living a lifestyle far in excess of their income without attempting to make any meaningful repayment.

The debtors assert that they are not spending beyond their means because they are spending "their own money" in the form of gifts from Robert E. Jackson, student loan overages from Sallie Mae and transfers from Mr. Jackson's deferred compensation account. Debtors' argument overlooks the fact that Robert E. Jackson and Sallie Mae are, indeed, unsecured creditors listed on Schedule F of the debtors' bankruptcy petition. When the debtors spent money on meals at restaurants and outlet shopping on vacation, they were spending money they were not earning. How it can be more acceptable to spend money obtained from one source than another is a distinction that escapes the Court. In addition, the debtors' argument overlooks the fact that regularly relying on Mr. Jackson's deferred compensation account is unsustainable. To they extent that the debtors relied on large infusions from the deferred compensation account they were still "living beyond their means."

6

The defense also relies on the fact that Mrs. Jackson has significantly reduced her lifestyle. Indeed, she has reduced it twice. Once when she divorced Mr. Meek, and a second time after she married Mr. Jackson. However, the debtors still have an excessive lifestyle for debtors with a combined net income of approximately $4,500. The definition of "luxury" is relative. Although her lifestyle may be anything but luxurious from Mrs. Jackson's customary point of view, it is luxurious for a person of modest means who is contemplating bankruptcy. Furthermore, Mrs. Jackson's personal narrative in no way accounts for Mr. Jackson's considerable debt load. Because the debtors are only recently married, they have distinct financial histories. *Strangely, neither party made any attempt to explain why Mr. Jackson got in over his head as far as he did.*

The Court is not unsympathetic to the debtors. Clearly, they are needy in the legal sense. However, debtors' failure to satisfy the lack of honesty prong is sufficient grounds for the dismissal of debtors' case. Debtors' consistent pattern of overspending fails to comport with the honesty prong as that is defined as a term of art.

Accordingly, the UST's motion to dismiss is granted.

An order will issue with this opinion.

\#    \#    \#

Service List:

Stephen Earl Jackson
508 N Market
Minerva, OH 44657

Amy L Jackson
508 N Market
Minerva, OH 44657

United States Trustee
Suite 441
H.M Metzenbaum U.S. Courthouse
201 Superior Avenue
Cleveland, Oh 44114

Clark Battista
211 N Market St
Minerva, OH 44657-1615

Donald M Miller
1400 Market Ave N
Canton, OH 44714-2608

Lenore Kleinman ust04
Office of the US Trustee
Howard M. Metzenbaum U.S. Courthouse
201 Superior Avenue, East
Suite 441
Cleveland, Oh 44114-1240